(C. D. 112)

RODWAY SALES CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 1, 1939)

*Walden & Webster* (*Jacob L. Klingaman* of counsel) for the plaintiff.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Joseph F. Donohue,* special attorney, and *Frank X. O'Donnell, Jr.,* junior attorney), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is a suit against the United States wherein the plaintiff seeks to recover a certain sum of money claimed to have been unlawfully exacted by the collector of customs at the port of New York on an importation of merchandise at said port described on the invoice as "Reception canapés." This merchandise consists of light, thin, crisp articles that have been baked in a mold so that a slight depression exists therein, into which, according to the testimony, various types of articles used in making hors d'oeuvres may be deposited for convenience in eating.

The collector classified the imported commodity for duty under the provisions of paragraph 733 of the Tariff Act of 1930 at 30 per centum ad valorem. That paragraph is as follows:

PAR. 733. Biscuits, wafers, cake, cakes, and similar baked articles, and puddings, all the foregoing by whatever name known, whether or not containing chocolate, nuts, fruits, or confectionery of any kind, 30 per centum ad valorem.

The plaintiff claims that the importation is entitled to enter the commerce of the country free of duty under the provision of paragraph 1623 of the same act as bread, or, as an alternative claim, that it is dutiable at only 20 per centum ad valorem under paragraph 1558 as a nonenumerated manufactured article. We quote the pertinent portions of the paragraphs under which plaintiff claims as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of * * * all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.
[Free List.]
PAR. 1623. Bread: *Provided,* That no article shall be exempted from duty as bread unless yeast was the leavening substance used in its preparation.

The plaintiff took the deposition of Mr. William R. Walker, technical manager for Huntley & Palmers, Ltd., of Reading, England, the bakers of the merchandise in suit. The same was received in evidence and his testimony discloses that for twenty-nine years he had been associated with the above-named firm and was, at the time of giving the deposition, responsible for the supervision of all the practical work; that he was thoroughly familiar with the baked articles produced by that concern because he had always been connected with the manufacturing

department thereof. He stated that he was thoroughly acquainted with the way the merchandise here in suit was manufactured, although it was not manufactured under his direct supervision. He established that the articles in their present form had been on the market two and one half years and that the formula for making them had been the same during that time. He was asked to—

State what ingredients were used and the proportions thereof in the production of the merchandise referred to in interrogatory 6, how these ingredients were combined, and what processes, baking or other, were employed in its production up to the time it was ready to be packed.

To this he gave the following answer:

36 lbs. Wheatmeal, 6 lbs. Mashed Wheat, 3 lbs. Flour, 3 lbs. Cornflour, 6 ozs. Salt, 18 ozs. Glucose, 18 ozs. Fat, 2½ ozs. Yeast, 50 Pints of Water, 6 ozs. Burnt Sugar, and 4½ ozs. Colour. The last two items are not essential and can be left out if necessary. The colour is made from a mixture of 5 grams Orange 1, 7 grams Tartrazine, and 600 CC Water. The ingredients are beaten together and then poured on to hot plates and baked.

He further stated yeast was used for leavening purposes and that it was the only leavening substance contained therein. On cross-examination he was asked under what baker's classification other than brand name, he would place the involved merchandise and he answered that he would say it is a kind of crispy bread. He further said it was similar to ordinary loaf bread in that the same type of flour is used in making wheaten bread, the gluten contents of the flour being similar to that of the flour used in making that bread, but that while the dough of commercial bread was allowed to rise in the oven, the dough of the merchandise here is squeezed between plates to produce the molded shapes. The dough or batter is softer than the dough of loaf bread, and is prepared by the beating up process.

Mr. Wm. E. Dolan, a salesman for the plaintiff corporation, testified that he was familiar with the use of these articles as heretofore described and that he had also seen ordinary bread used in the same manner, that is, as a repository for such articles as shrimp, caviar, etc.; that the depression served to keep such commodities from running off; that the articles were used as a base for hors d'oeuvres.

The defendant called Mr. Albert E. Tolley, general superintendent of a large baking company in this city, who had experience in every branch of the baking of bread. At the Government's request he had taken the ingredients described in the deposition of Mr. Walker in the proportions as by him described and, under what he termed ideal conditions, had endeavored to produce a loaf of bread by following the formula used in making the instant commodity. He produced the result of his experiment in evidence and it was marked Illustrative Exhibit A herein. This witness defined bread as follows:

Bread to me is a product obtained from baking a piece of fermented dough that has been shaped either by hand or machine.

In describing his efforts to make a loaf of bread according to the formula given for making reception canapés he stated:

When we took this formula there was so much liquid in it that it didn't have any elasticity, didn't have any body. It was a very, very soft mass. It was impossible to shape it. So we poured it into the pan. We tried to proof it, which is a term we use for final rising of the dough before it is baked, and it wouldn't move. What I mean when I say "move," I mean it wouldn't rise. So we baked it, and this is the result. There is not enough, well, there is not enough leavening agent in there, not enough yeast to produce carbon dioxide enough to push that thing up.

Judge EVANS. Push the mass up?

The WITNESS. Push the mass up.

His testimony concerning the conditions under which he baked Illustrative Exhibit A was as follows:

That was made under what we term ideal conditions. We tried to keep the room where it was mixed and handled as close to 80 degrees as possible. It was proofed in a steam cabinet, it was around 100 degrees Fahrenheit. Then it was baked in an oven about between 400 and 425 degrees Fahrenheit.

Q. How long was it proofed?—A. That was proofed about an hour.

Q. And how long was it baked?—A. About 40 minutes.

Q. And in making the ordinary loaf of bread how long is that proofed?—A. Depending on the type bread. A dark loaf like this would proof in about 45 minutes and would bake in about 40 minutes.

Q. Well, can you state then whether or not Exhibit A had been mixed and baked under the same conditions as you would mix and bake a loaf of bread?—A. They were made under what we term ideal conditions. They were handled just as a regular bread dough would be handled.

Q. When you mixed the ingredients from which Exhibit A was made how did it compare with the ordinary dough from which an ordinary loaf of bread is made?—A. It was considerably softer, didn't have any body at all.

Q. What did you do with it after you had mixed it?—A. Well, after we mixed it we let it stand to see if it would rise, but it was too soft and there wasn't enough yeast in there.

Q. Now will you compare the physical characteristics of Exhibit A with the physical characteristics of a loaf of bread?—A. Well, outside of the bottom shape, which is the shape of the pan, there is no similarity at all. There is no variation at all, no expansion. A regular loaf of bread will in proofing, in the final stage of proofing, will more than double its size and it will expand further in the oven.

Q. Now, to what extent, if any, has Exhibit A expanded?—A. It hasn't expanded at all. If anything it has gone back a little. I can tell that right by that ridge there.

Q. You refer to the ridge at one end of the top?—A. That ridge is all around. At one time that was that high and in baking it has settled down. Rather than pulled up it settled down.

Mr. John J. Lynch, superintendent of the wafer division for another large baking company, who has been engaged in such work since 1892, solely in the wafer branch of the baking, stated that he had been given the formula described by the plaintiff's witness as the one used in baking the imported commodity and that he had baked an article

using that formula, samples of which he produced in evidence, which were marked as Exhibit C. He described the method of baking Exhibit C as follows:

A. Well, the formula was put together in our laboratory, and I just took the formula upstairs to the wafer machine that we manufacture our wafer shells on, and I deposited it on hot plates, a size 11 x 18, with a spoon. It was a rather fluid mass, and I baked a full sheet that size—and the thickness and shape was determined by the plates—in two minutes at 330 degrees Fahrenheit.

This witness stated that Exhibit C had been leavened through heat,

* * * hot plates, the generation of steam.

Q. Yes. Now, was it lightened or leavened by the yeast content?—A. No.

Q. Would Illustrative Exhibit C have been leavened to the same extent if no yeast had been contained in the batter?—A. Yes.

Mr. Lynch was asked the following questions and gave the following answers:

Q. Mr. Lynch, what, as a result of your experience in the baking business, would you describe as a wafer?—A. I would describe as a wafer a batter dough containing about 65 per cent or 60 per cent or over of moisture, poured on hot plates, the thickness and design being determined by the plates they were baked on, and brought out in sheets, standard size about 11 x 18, containing when they leave the machine about one to one and a half per cent moisture.

Q. Does Illustrative Exhibit C come within or without that definition?—A. I believe it comes within that definition.

Q. Now, does Illustrative Exhibit D, the Sunshine product, come within or without that definition?—A. It does.

Q. Come within?—A. Within.

Q. I show you Collective Exhibit 2, the merchandise in this case. Does that exhibit come within or without your definition?—A. It comes within my definition.

On cross-examination he testified as follows:

X Q. Now, why do you say that yeast had nothing to do with raising the commodity you baked and which is called Illustrative Exhibit C?—A. From my experience in the baking of the wafers, the batter has got so much moisture in it that the hot plates generate steam immediately and raise the wafer sheet to the limit the plates will permit.

Mr. Robert W. Tolley, a baker of several years' experience, testified that he had received a copy of the formula used in baking the imported commodity and that he took it to a bakery that is in the business of making wafers, where he mixed the dough with the wafer man from this company present, took the dough to the wafer machine and pumped it into the wafer plates and baked it. He described the mixture as batter, a very thin batter, and stated when asked the difference between a batter and a dough—

Well, a batter, that you have to pour; and a dough you can mold and make up by hand or by different types of machines.

He stated that the batter baked three minutes at about 350 degrees and that the product obtained was similar to Exhibit 2 except in shape.

His article was received in evidence and marked Exhibit E. This witness also testified on cross-examination that the yeast did not contribute to the raising of the wafers because there was not any time for fermentation and further that the salt content would retard fermentation.

The plaintiff relies largely upon the case of *United States* v. *American Railway Express Co.*, 11 Ct. Cust. Appls. 88, T. D. 38734, which related to the classification of ice cream cones. The appellate court in that case held that the cones should not have been classified as wafers because a wafer signified an article that was to be served and eaten like bread, biscuits, and cakes, and that an ice cream cone is an incidental container of ice cream and does not serve as an independent article of food. Furthermore, the court held that a wafer was flat and that the cone had been molded to the form in which it was sold, that is, rolled up. That case held that the term "wafer" never had been applied to cones in common speech. In a well-prepared brief the plaintiff in the instant case states:

All the reasons assigned by the Court of Customs Appeals for holding the cones not to be covered by the term "biscuits and wafers" are applicable to the present case. The merchandise at bar is not a separate article of food but is used in the conjunction with caviar, fish, and other materials in the same way that the cones are used in connection with ice cream. The articles likewise, as shown by the exhibit, have their own peculiar name which is neither wafers nor biscuits.

Plaintiff's attorney also cites the case of *United States* v. *Menzel & Co.*, 9 Ct. Cust. Appls. 16, 17, T. D. 37844, upon the point that the predominant use of articles named in paragraph 733, *supra*, is that of independent articles of food. He also criticises the limitation made by the court in the case of *H. Colthoff* v. *United States*, 17 C. C. P. A. 388, T. D. 43832, wherein it was said that paragraph 1522 of the Tariff Act of 1922, the correlative paragraph to 1623 of the act of 1930, was intended to cover only "well known commercial bread." He thinks it was improper so to limit the meaning of a single term like "bread" but that under the decisions such a term, not being ambiguous, must be construed according to the ordinary meaning without recourse to extraneous matter such as Committee Reports, etc. Nevertheless, accepting the decision, he contends that the commodity now before us should be held to be free because it was made of the materials ordinarily found in bread.

In connection with the reference made by the attorney to the case of *American Railway Express Co.*, *supra*, it would seem from the testimony that we may paraphrase the language of that case, where it was held:

And it is certain that the name "wafers" is never applied to them in common speech, nor would it generally be regarded as at all appropriate or applicable to them.

From the record in the instant case and from the appearance of the commodity in question it would seem appropriate to state that—

It is certain that the name *"bread"* is never applied to the *Reception Canapés* in common speech, nor would it generally be regarded as at all appropriate or applicable to them.

The word "bread" has been defined in Webster's New International Dictionary as follows:

*Bread* (1) An article of food made from flour or meal by moistening, kneading, and baking. Previous to baking the dough is usually treated in some way to render it light and porous, as by mixing it with yeast or leaven or baking powder, by moistening with carbonated water (giving aerated bread), or even by beating it to inclose bubbles of air. The yeast or leaven sets up fermentation, giving off the gas carbon dioxide, which inflates, or "raises," the dough; the same gas is generated by the interaction of the acid and the carbonate in baking powder or of sour milk and soda, or escapes from the carbonated water. In salt-rising bread fermentation is set up by germs from the air, the salt preventing undesirable processes.

Funk & Wagnalls Standard Dictionary thus defines it:

*Bread.* An article of food made of the flour or meal of grain, mixed with water or milk and salt, to which yeast, baking-powder or the like is commonly added to produce fermentation and rising, lightness or sponginess, the mixture being kneaded and baked in loaves or as biscuits, rolls, etc.

While the testimony is that the ingredients used are the same as are used in the making of bread, it is also clearly proven that they are not used in the right proportion to make a bread within the foregoing definitions because the product could not be made by kneading since the mixture produced is not dough but more in the nature of batter. Furthermore, it would not rise as would the ordinary bread. Again, it is not prepared in form and shape nor baked in the same manner as ordinary bread.

The same distinction could be made between this commodity and bread as was made between Waverly shortbread in the case of *United States* v. *Dunlop & Ward*, 6 Ct. Cust. Appls. 278, T. D. 35505, since the instant commodity is hard and flat as was the Waverly shortbread.

Finally, we think the Government case is strengthened by the case of *H. Colthoff* v. *United States, supra,* wherein the article before the court was Holland rusks. The following language of the court is especially appropriate:

We agree with that portion of the conclusion reached by the lower court to the effect that the importation is not bread, such as is provided for in paragraph 1522, although it is leavened with yeast. Some of the articles mentioned in paragraph 733, made with or without yeast, in a broad sense may be bread but they do not constitute the bread of the free-list paragraph.

The court there was referring to paragraph 733 of the Tariff Act of 1922, which was reenacted without change as paragraph 733 of the act of 1930.

Furthermore, the court, after quoting from the Summary of Tariff Information, 1921, makes the following statement with reference to paragraph 1522 of the act of 1922, which is identical in language with paragraph 1623, *supra:*

In view of the foregoing we conclude that Congress by its language in paragraph 1522 did not contemplate the free listing of merchandise such as that at bar, but had in mind well-known commercial bread having characteristics and uses quite different from those of the merchandise at bar, and made in quite a different way.

For the reasons above set forth we overrule plaintiff's claim that the merchandise is bread under paragraph 1623, *supra.*

On the question of the claim that the merchandise should be held to be a nonenumerated manufactured article, the testimony of two of the witnesses of broad experience is that the imported article came within their understanding of the term "wafers." These two witnesses, Mr. Lynch and Mr. Robert W. Tolley, both expressed the opinion that the yeast present in the formula in question cut no factor in leavening the article but that in the making of such wafers the steam present would extend the batter until it fitted the mold. In support of their theory they produced exhibits made without yeast, baked in the same manner in which they had baked exhibits from the formula given for the instant merchandise, and to all appearances these illustrative exhibits had filled the mold as well as had the imported ones, although the illustrative exhibits were not of the same shape.

Whether or not Congress had in mind the classification of articles such as reception canapés within the term "wafers," they certainly fall within the descriptive language of paragraph 733, *supra,* viz, "similar baked articles." The testimony indicates that wafers are made from practically the same component materials; that they are baked in the same manner, that is, by being poured or pumped into molds and when finished have the same general appearance, both being firm, hard, and brittle baked articles. They are also similar in texture as can be determined by observation. Illustrative Exhibit D in evidence, known as Sunshine Wafer Shells, is identical in its intended use with the imported commodity.

We are, therefore, of the opinion that the claim under said paragraph 1558 should be and the same is hereby overruled inasmuch as the commodity is specially provided for in said paragraph 733.

Judgment will be rendered for the defendant. It is so ordered.