(C. D. 1641)

A. V. OLSSON TRADING CO., INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided September 23, 1954)

*Lawrence & Tuttle* (*George R. Tuttle, James R. Sharp, Walter I. Carpeneti,* and *Charles F. Lawrence* of counsel) for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*Mollie Strum,* trial attorney), for the defendant.

*Royce B. McKinley* as *amicus curiae.*

Before EKWALL and JOHNSON, Judges

EKWALL, Judge: The merchandise involved herein was imported from Sweden on or about June 19, 1951, and is described on the invoices as " 'Ry-King' Crisp Bread Light Thin." The shipment also included a product which is described on the invoices as " 'Ry-King' Crisp Bread Brown Medium." Both products were entered free of duty under paragraph 1623 of the Tariff Act of 1930 as bread, leavened with yeast, but the collector classified the former as baked articles under paragraph 733, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, at 10 per centum ad valorem, on the advisory classification of the appraiser and on a laboratory report to the effect that yeast was not present in sufficient quantity to be considered the leavening agent. It is claimed in the protest that Ry-King, light, thin, is bread which has been yeast leavened and is entitled to free entry under paragraph 1623.

The pertinent provisions of the tariff act and its modifications are as follows:

PAR. 733 [as modified by the General Agreement on Tariffs and Trade, T. D. 51802]. Biscuits, wafers, cake, cakes, and similar baked articles, and puddings, all the foregoing by whatever name known, whether or not containing chocolate, nuts, fruits, or confectionery of any kind, 10% ad val.

PAR. 1623 [Tariff Act of 1930]. Bread: *Provided*, That no article shall be exempted from duty as bread unless yeast was the leavening substance used in its preparation. [Free.]

PAR. 1623 [as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52373, and the President's proclamation of April 27, 1950, T. D. 52462]. Hard crisp bread made from rye flour and not more than 5 per centum of wheat flour, if any, with yeast as the leavening substance used in its preparation. [Free.]

The case was heard in San Francisco and in New York for a total of 9 days, resulting in a record of 1,381 pages, together with numerous exhibits. The witnesses called by the plaintiff were:

Gosta Walter Oscarsson, vice president of A. V. Olsson Trading Co., Inc., plaintiff and importer herein;

T. V. Terling, importer and part owner of Scandia Commercial Co. since 1925;

Z. S. Brown, examiner of merchandise at San Francisco;

Franz S. David Karp, doctor of chemistry and technical director of A. B. Wasa Spisbrödsfabrik, Filipstad, Sweden, manufacturer of the imported merchandise, who has been with that firm for 16 years and had previously been engaged in the manufacture of chocolate products and biscuits and wafers; and

Kenneth Morgareidge, doctor of biochemistry and food technologist, chief chemist for 2½ years with the Food Research Laboratories, Long Island City, N. Y., and previously engaged in clinical chemistry and teaching, and as biochemist and production supervisor of National Oil Products Co.

Defendant called:

James C Thomson, head of the Quality Control Department of the Globe Division of Pillsbury Mills, flour miller and feed manufacturer, who has been with the firm for 10 years and has charge of four chemical laboratories which perform baking tests on products from the flour mills;

Dallas Virginia Mick, chemist employed by the United States Customs Laboratory at San Francisco;

Kenneth E. Garrison, production manager of Ralston-Purina Co., maker of Ry-Krisp and cereals, employed by that firm for 22 years;

John B. Dallas, district sales manager of Ralston-Purina Co; and

Thomas Robert Schweitzer, chemist, employed by Ward Baking Co., manufacturer and distributor of bread and cakes, for 28 years, engaged in research and baking tests in connection with the firm's products and the ingredients used therein.

At the trial, samples of the two varieties of Ry-King were introduced into evidence as plaintiff's exhibits 1 and 1–B and 2 and 2–B. Ry-King, light, thin, the merchandise involved herein, consists of a crisp baked article about 3¼ inches long, 1¾ inches wide, and three-sixteenths to one-fourth of an inch thick. It has uneven top and bottom surfaces, with a pattern of small holes, some of which go through the article. One surface is whitish and the other a light tan. It is light and porous, having two crusts and an open texture in between. Ry-King, medium, brown, consists of a somewhat similar baked article, about 4½ inches long, 2⅜ inches wide, and five-sixteenths of an inch thick. It has an uneven surface top and bottom, with a pattern of holes, most of which do not go through. It is of a medium-brown color, has two crusts with porous material between, but is heavier and denser than Ry-King, light, thin.

Dr. Karp described the method of production of Ry-King, light, thin (hereinafter referred to as Ry-King) as follows: The ingredients are 100 percent rye flour, yeast, salt, and water. Normally, yeast in the amount of 2 percent is used, but the quantity varies according to the sugar content of the flour and may be as little as 0.9 percent. The water content also varies with the characteristics of the flour and ranges from 50 to 63 percent, based on the weight of the dough. The ingredients are mixed in a closed kneading machine for 40 minutes. No air is beaten in. After the dough is dusted with flour, it goes into a molding machine where cakes 2.5 mm. thick and about 300 mm. in length and width are formed. The dough is punched with small holes to make it possible for the produced gases to escape, to create separate little buns between the holes, and to hold the layers together. The material is then placed on a net conveyor, where it remains for 30 minutes, during which time its temperature rises from 20° C. (68° F.) to 32° C. (89° F.), and it increases in thickness to 3 mm. The dough is carried through the ovens on steel netting and is baked for 10 minutes at temperatures ranging from 325° C. (617° F.) at the beginning to 150° C. (302° F.) at the end. On leaving the oven, the articles are 5 to 5½ mm. thick and about 290 mm. in length and width.

They are conveyed to the top of the oven where they dry for several hours. Then, they are cut into the small pieces which form the finished product.

Two issues are presented by this case: First, whether Ry-King is "bread," as that term is used in the tariff act, and, second, whether yeast was the leavening substance used in its preparation. We shall consider these questions separately, referring to the testimony pertinent to each.

Mr. Oscarsson testified that he was familiar with the merchandise involved herein and that his firm imports about 700 to 800 tons a year. He has seen such merchandise since childhood; it is used as bread instead of soft bread, in this country mostly by people of Scandinavian descent. In Swedish, it is called Spisbröd, Spisknäckebröd, Delikatess Knäckebröd, and Delikatess Kuvertbröd. The Ry-King involved herein is the same type of product as Delikatess Knäckebröd and Delikatess Kuvertbröd. Such crisp bread is used more frequently in Sweden than in the United States, constituting one-third of the total amount of bread consumed in Sweden.

Mr. Terling testified that his firm imported products like plaintiff's exhibits 1 and 2 from various firms in Sweden from 1925 to 1939 and has since purchased them from the plaintiff herein. They are called Knäckebröd, Spisbröd, and Delikatess Bröd. In 1936 or 1937, his firm asked the maker of the instant merchandise to use the name Ry-King on its products.

Dr. Karp read the following definition of bread from a book entitled "Food Technology" by Samuel C. Prescott and Bernard E. Proctor, which, he said, coincided with his ideas and included both hard and soft breads:

> The following official definitions for "bread" are used in the United States: Bread is the product made by baking a dough consisting of a leavened or unleavened mixture of ground grain and/or other edible farinaceous substance, with potable water, and with or without the addition of other edible substances.

Mr. Thomson and Mr. Garrison, however, agreed with the following definition from Webster's International Dictionary, Second Edition, Unabridged:

> **bread,** An article of food made from flour or meal by moistening, kneading, and baking. Previous to baking the dough is usually treated in some way to render it light and porous, as by mixing it with yeast or leaven or baking powder, by moistening with carbonated water, or even by beating it so as to enclose bubbles of air. The yeast or leaven sets up fermentation, giving off the gas carbon dioxide, which inflates or "raises," the dough; the same gas is generated by the interaction of the acid and the carbonate in baking powder, or of sour milk and soda, or escapes from the carbonated water.

A number of products were introduced into evidence for the purpose of comparison, and the witnesses were asked whether they considered them to be bread. The chief of these was a product known as Ry-

Krisp (defendant's illustrative exhibit A), which is a crisp baked article, about 3½ inches long, 1⅞ inches wide, and one-fourth of an inch thick. One surface is uneven with the word "Ry-Krisp" stamped thereon and with three rows of holes, which do not go through. The other surface is flat. The bottom crust is thicker than the top crust, and there is porous material in between. It is light brown in color. A line divides the article in half and facilitates breaking. The following statement, among others, appears on the box: "EAT RY-KRISP AS BREAD AT EVERY MEAL."

The witnesses Oscarsson and Karp did not consider Ry-Krisp bread, although they said Ry-King was bread. The witnesses Thomson, Dallas, Garrison, and Schweitzer did not consider either Ry-Krisp or Ry-King bread.

Other exhibits are described on their respective wrappers or packages as Norwegian Ideal Flat Bread; Danish Rye Crisp Crackers; Old Fashion Knäckebröd—Fairway Crisp Rye Bread; Egte Norsk Flat Bröd; Flakee-Ry Hardtack Discs; Co-op Health Bread—Rye Hardtack; Hol-Ry—Whole Rye Wafers; Manischewitz Thin Tea Matzos; Manischewitz Unsalted Matzos; Thin Sliced Rye Sandwich Bread; and Swedish Rye (defendant's illustrative exhibits B through L, respectively). According to statements on the wrappers, not all of these contained the same ingredients as the merchandise involved herein. Some contained yeast and some did not. All except the first two were American products. The last two were loaves of rye bread, which Dr. Karp, Mr. Thomson, and Mr. Garrison considered to be bread. Dr. Karp called the others bread also, but the Government's witnesses did not.

Mr. Thomson stated that soft bread was the only logical form of bread, and that plaintiff's exhibits 1 and 2 were wafers because of their physical characteristics, that is, shape and dimension. Mr. Garrison said that Ry-Krisp is a type of crisp bread, also called a wafer or a cracker. Up until 1932 or 1933, it was made in the form of a round disc with a hole in the middle and was called bread or Scandinavian bread.

The product before us, according to the evidence, is leavened, but it is not a soft loaf of bread. Besides the Swedish names, the witnesses called this type of article crisp bread, wafers, or crackers. Mr. Oscarsson said it is used in this country with the main course of a meal by people of Scandinavian descent. Mr. Dallas stated that he had seen it used with hors d'oeuvres, salads, and soups. There was evidence that it would keep, in the package, for a year or more, but that soft bread would spoil within a few days.

"Bread" is a word that is sometimes used to mean food in a general sense, but, commonly, in the United States, it denotes a loaf baked from flour and water and other ingredients, which has been leavened,

and which has a soft, porous interior and a harder crust. It is served in slices. The term "unleavened bread" is also in use and is generally understood to mean an unrisen type of baked product, also called matzoth or matzo. The tariff act provides for free entry for bread, provided yeast was the leavening substance used in its preparation. Unleavened bread or matzoths are, therefore, excluded. The question remains as to whether the term is limited to the well-known loaf of soft bread or whether so-called crisp bread is included.

The present provision for bread first appeared in the Tariff Act of 1922 (paragraph 1522). The Summary of Tariff Information, 1921, prepared by the Tariff Commission for the use of Congress in drafting that statute, stated that the paragraph was designed to allow free entry of ordinary commercial bread, but not of other baked articles.

Under that act, the Board of General Appraisers held that various forms of Swedish bread were entitled to free entry, provided it was established by stipulation or evidence that yeast was the leavening substance. *Pollack Weeks & Co.* v. *United States*, 45 Treas. Dec. 907, Abstract 46940 (Swedish health bread); *Swedish Produce Co.* v. *United States*, 46 Treas. Dec. 649, Abstract 47815, and *Swedish Produce Co.* v. *United States*, 47 Treas. Dec. 915, Abstract 48621 (Swedish hardtack); *C. L. Benson* v. *United States*, 47 Treas. Dec. 1019, Abstract 49155 (Spisbröd, Spisknäckebröd, and Delikatess Kuvertbröd); *G. W. Sheldon & Co.* v. *United States*, 48 Treas. Dec. 623, Abstract 49838 (Delikatess Kuvertbröd).

These decisions were called to the attention of Congress by the Summary of Tariff Information, 1929 (p. 2217), while the Tariff Act of 1930 was being prepared. The summary also stated that in the United States, the word "bread," unqualified, was understood to mean wheat bread, but it went on to refer to other types of bread, such as milk bread, rye bread, raisin bread, brown bread, Boston brown bread, and Swedish bread. The latter was described as:

* * * a hard, dark wafer, which is yeast leavened, made from rye flour. The bread usually comes packed in small paper cartons holding one-half to 1 pound. It is usually round, although some is rectangular in shape. Practically all are labeled "Swedish Bread," with an accompanying designation in Swedish such as "Spisbröd" or "Spisknäckebröd."

At hearings before the House Ways and Mean Committee, there was considerable discussion of Swedish bread. (Hearings before the Committee on Ways and Means, House of Representatives, 70th Congress, 2d Session, volume 15, pp. 8080, 8193–8201.) It was stated that such bread was not actually yeast leavened and an amendment to the tariff provision was proposed to the effect that "bread, to come within the provisions of this paragraph, must contain yeast in such quantity as to create a light raised loaf, such as is known

as bread in the United States." However, the House did not adopt the suggestion.

In hearings before a subcommittee of the Senate, reference was made to Swedish bread, but the witnesses and the committee members apparently were uncertain whether it was on the free list or not. (Hearings before a Subcommittee of the Committee on Finance, United States Senate, 71st Congress, 1st Session, volume 16, pp. 154, 156.) In any event, the provision for bread was amended by the Finance Committee to add a limitation "and unless it was light raised, and is commonly known as bread." (Senate Report No. 37, 71st Congress, 1st Session.) The report of the committee stated that the definition of bread had been revised so as to exclude various forms of so-called Swedish rye breads which resemble hard crackers in appearance and taste.

When the bill came before the Senate, Senator Frazier offered an amendment to strike out the committee's provision and substitute one providing for countervailing duty in certain circumstances. After discussion, this was withdrawn, but a countervailing duty provision was adopted. The question of the dutiability of Swedish bread was left to the Conference Committee. (Congressional Record, volume 72, part 6, p. 5931; Supplement to Tariff Information Items in Tariff Bill of 1930, p. 350.) The Conference Report on the bill stated that the effect of the Senate amendment was to make so-called Swedish bread dutiable under paragraph 733 and to provide a countervailing duty in certain circumstances. The Senate receded on both amendments. (House of Representatives, Report No. 1892 on Tariff Bill of 1930, June 13, 1930.)

In the meantime, on January 27, 1930, the Court of Customs and Patent Appeals held in *H. Colthoff* v. *United States*, 17 C. C. P. A. (Customs) 388, T. D. 43832, that articles known as Holland rusks were not classifiable as bread under paragraph 1522, Tariff Act of 1922, although they were leavened with yeast. In the course of the opinion, the court referred to statements in the Summary of Tariff Information, 1921, and concluded that Congress did not contemplate the free listing of merchandise such as that at bar, but meant well-known commercial bread having different characteristics and uses and prepared in a different way.

Whether or not Congress became aware of this decision before the Tariff Act of 1930 was finally approved does not appear. In any event, the merchandise involved was not similar to products known as Swedish bread or crisp bread. It was made with different ingredients and was baked in molds, split in the middle, and the cut sides toasted. The court found that the article when it came from the mold responded to the provisions of paragraph 733 for "Biscuits,

wafers, cake, cakes, and similar baked articles," but that the subsequent processing changed it into a new and different product. It was, nevertheless, held dutiable under paragraph 733 by similitude.

See also *Rodway Sales Corp.* v. *United States*, 2 Cust. Ct. 149, C. D. 112, which held that reception canapés, consisting of light, thin, crisp articles that had been baked in a mold so that a slight depression existed therein, into which small pieces of food might be deposited for convenience in eating, were excluded from the provision for "bread" in paragraph 1623, Tariff Act of 1930.

Since the articles in both of these cases were different from that involved herein, we do not think they are controlling as to whether crisp bread falls within the provision for "bread" in the tariff act.

Note in this connection the trade agreement with Sweden, effective August 5, 1935, T. D. 47785 (terminated June 30, 1950, T. D. 52505), and the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52373, both of which provided specifically for crisp bread under paragraph 1623. See also statements in the Summaries of Tariff Information, 1948, volume 16, pp. 181–182.

It is our conclusion that Congress intended to cover Swedish or crisp bread by the provision for "bread" in paragraph 1623, provided yeast was the leavening substance. An attempt was made to exclude such bread, but it was unsuccessful, and the only limitation on the term "bread" is that yeast must be the leavening substance. This has been the understanding not only of customs officials, who, according to the evidence herein, have permitted free entry to crisp breads until recently, but also of the negotiators of the trade agreements above mentioned, and of the United States Tariff Commission. Note also that in the instant case, Ry-King, medium, brown, a crisp bread, was classified by the collector under paragraph 1623, but such classification was denied to Ry-King, light, thin, on the ground that yeast was not the leavening agent.

The question then arises as to whether the instant merchandise was leavened by yeast. On this point, considerable testimony was presented by both parties, much of it in conflict.

By definition, and according to the testimony of the witnesses, leavening is a lightening process by which dough rises through the production and retention of gas in the dough mass. Leavening agents include yeast, baking powder or other chemicals, sour dough, air, and steam.

The witnesses were in agreement that the instant merchandise was leavened, but disagreed as to the agency which caused it.

Dr. Karp testified that yeast was the sole and exclusive leavening agent used in the preparation of crisp breads by his firm. He stated that the leavening process started when the dough was in the knead-

ing machine and continued until it was placed in the oven and reached a temperature of 70° C. (158° F.), at which point the yeast cells were killed. He explained that the yeast enzymes work on the grain in the dough, transforming the starches into sugar, and the proteins into amino acids, which give the distinctive flavor of bread. The yeast splits the sugar molecules into 2 molecules of carbon dioxide and 2 molecules of ethyl alcohol in what is called the fermentation process. The carbon dioxide begins to escape during this process and continues to do so until the last part is lost in the baking oven. Dr. Karp added that yeast is used not only to make the dough rise but to give the typical bread taste to the product. In his opinion, leavening by other agencies would not produce the same rising and flavoring as yeast leavening.

Dr. Karp described in detail five tests which he had made from time to time to determine whether Ry-King is yeast leavened. These included tests which he said showed an increased acidity in the product, an increase of 13 percent in the number of yeast cells, the presence of alcohol in the steam produced during the baking, an increase in the protein content of the product, and an increase in the tenderness of the product. As the result of the tests, it was Dr. Karp's opinion that his merchandise was yeast leavened. In cross-examination, he testified, however, that steam will cause some leavening other than from yeast.

However, according to the testimony of other witnesses, these tests did not indicate leavening, but showed that fermentation had occurred. In their view, leavening and fermentation were not the same, and fermentation could take place without leavening. Mr. Garrison explained:

Yeast fermentation is what results at the growth of yeast, which is a feeding of the yeast on starch and sugars, and converting those to alcohol and carbon dioxide. Enzyme action on proteins, that is fermentation. * * *

[    *    *    *    *    *    *    *    ]

* * * Yeast leavening would mean that the carbon dioxide that would be formed from fermentation would have to be held by something to give a rising effect in the finished products. And the flavoring, yeast flavoring is a result of fermentation, changing of sugars and starches into various other products. * * *

The Government's position is that a product made of 100 percent rye flour cannot be leavened by yeast. The reason for this, according to the witnesses Thomson, Garrison, and Schweitzer, is that the gluten component in rye flour is different from that in wheat flour and does not form a dough skin or skeleton which would retain the carbon dioxide resulting from yeast fermentation long enough for the dough to rise and keep its shape during baking. Therefore, ordinary rye bread always contains a high percentage of wheat flour. Otherwise, the product would be a heavy, soggy mass, which had not risen in the oven.

Dr. Karp said that rye flour contained gluten and that its chemical properties, but not its physical properties, were the same as those of wheat gluten. He agreed that an ordinary commercial loaf of rye bread could not be produced from 100 percent rye flour, but stated that hard breads could be and were so made. In his opinion, the leavening effect of yeast on a whole rye dough will remain throughout the baking process despite the difference between the gluten in rye flour and that in wheat flour. He explained that the greatest increase in the volume of Ry-King occurred at the commencement of the baking process where the conditions were ideal for the production of carbon dioxide from yeast. He said that the water would boil only about a minute before the product left the oven and that by that time the skin of the dough had become stale and stiff, so that the possibility of rising by means of steam would be small. He did concede that steam resulting from the boiling of water in a mixture would cause some leavening other than from yeast.

Mr. Garrison testified that he had experimented with various ways to leaven crisp rye breads and had found that steam was the only possible leavening agent. He stated:

* * * I spent about 5 months researching a good part of the time on ways to leaven Ry-Krisp or crisp breads. Several of the things we tried would be to add dry ice, in order to whip carbon dioxide in, which is the same thing—leavening adjunct—you get from yeast; even used products such as ginger ale to try to get a source of carbon dioxide that would maintain through the baking period to get leavening, and without I was not able to get any product in there that would maintain a flow of gas during the baking period long enough to set up the dough and batter of Ry-Krisp until it could hold a leavening form. In other words, in order to get leavening into a batter such as you have in Ry-Krisp, where you don't have a gluten developed, you must have a constant source of gas that is fast enough and at the right places to offset the losses that you get; and we have never in all this research found anything that would do it except steam—that would give enough source of gas to keep replacing the gas that is lost until the batter is set up to make a leavened product. The carbon dioxide in yeast goes out, and then it falls right flat if you don't have something else to bring in—if you don't bring the steam in to replace it.

He stated also that in an 8½-gram wafer, only 4 to 6 cubic inches of carbon dioxide would be obtained during the fermentation period, but that 1,400 cubic inches of steam are generated during baking, so that steam is replaced as soon as it is lost; therefore, even if carbon dioxide were retained throughout the baking process, the leavening effect of the yeast, as compared to that of the steam, would be 4 or 6 to 1,400. In his opinion, the carbon dioxide would be lost too quickly to have any permanent leavening effect.

Mr. Garrison's testimony is based upon his experience with Ry-Krisp, a product heretofore mentioned, which is made with 100 percent rye flour, water, and salt. In making this product, air is beaten in during the mixing, increasing the volume 50 to 60 percent. It is baked on a steel band rather than a wire netting, so that it does not shrink

in length and width, but does shrink in overall volume. It is leavened by the steam produced during baking.

In comparing Ry-Krisp and Ry-King, Mr. Garrison stated that the specific densities of the two products are 0.57 for Ry-Krisp and 0.56 for Ry-King; that both contain the same type of flour particles; that Ry-King has smaller auger holes than Ry-Krisp; that Ry-Krisp has a coarser dusting flour that contains a certain amount of ground breads; that both have rye flavor and an open texture inside. It also appears that 65 percent water is used in Ry-Krisp and usually 63 percent in Ry-King.

At the trial, Mr. Garrison produced two samples of Ry-Krisp which he had made, one with yeast and one without yeast (defendant's illustrative exhibits M and N, respectively). Tests made on these samples indicated that they had the same specific volume and porosity. The product containing yeast was slightly darker in color, had a slightly different flavor, and was slightly harder. Both were 0.3125 of an inch thick when rolled out and were 0.2313 of an inch thick after baking. As a result, Mr. Garrison concluded that illustrative exhibit M was not yeast leavened because it had the same porosity as illustrative exhibit N.

Subsequent to the first hearing, Mr. Schweitzer prepared samples using the Ry-King formula as given to him by counsel for the Government from Dr. Karp's testimony. He used 63 percent water based on the weight of the flour and used pans instead of netting on which to bake the products. The results were three products, one with 2 percent yeast, one without yeast, and one with dead yeast (defendant's illustrative exhibits O, P, and Q, respectively). Mr. Schweitzer stated that they were 2½ mm. thick when they went into the oven and were 2¼ mm. thick when they came out. They were all tough and hard and lacked volume. In these experiments, he said, the yeast had no leavening effect at all. An examination of these samples shows that they have very little porosity and do not resemble Ry-King. Mr. Schweitzer believed the reason was that he had used a dough of a stiffer consistency than that used in Ry-King.

Mr. Garrison also made samples following the Ry-King formula, using 63 percent water, based on the weight of the dough, equivalent to about 130 percent, based on the weight of the flour. Defendant's illustrative exhibit R was made with 2 percent yeast and defendant's illustrative exhibit S was made without yeast. Mr. Garrison compared the two products and testified that the specific density of illustrative exhibit R was 0.574, while that of illustrative exhibit S was 0.565; that illustrative exhibit R was slightly darker in color and had a slightly different flavor; that both products had the same tenderness; that both had uneven tops and bottoms, dusting flour, and auger holes, and both showed leavening. He concluded that neither was yeast leavened. He found both samples similar to

Ry-King and drew the inference that Ry-King was not yeast leavened. An examination of the samples shows that they resemble each other and are fairly similar to Ry-King.

In rebuttal, plaintiff produced the testimony of Dr. Morgareidge, who described certain experiments he had made in order to determine whether a dough product prepared with 100 percent rye flour could be leavened by yeast. For this purpose, he prepared samples of rye dough, approximately in accordance with the Ry-King formula, using water amounting to three-fourths of the weight of the flour, or 42 percent of the weight of the dough. To one batch he added live yeast and to the other dead yeast. After kneading, the dough was placed in a series of test tubes. These were kept in an incubator at 37° C. (99° F.) for 2 hours and then put into a preheated oven at 260° C. (500° F.). One tube of each series was withdrawn after 3 minutes, by which time the temperature of the dough was 63° C. (145° F.), which is high enough to kill yeast cells. Another pair was removed after 12 minutes, at which time the temperature of the dough was 104° C. (219° F.). The water had boiled after the seventh minute of baking. The remaining pair was withdrawn after 30 minutes. The results were as follows: The dough with the live yeast increased by 81 percent of its original volume during the incubation period, but the other did not change. During the 3-minute baking period, the former increased to 86 percent of its original volume, and the latter to 18.6 percent thereof. The former had more porosity; bubbles were evident. At the end of 12 minutes, the volume of the live yeast sample remained at 86 percent of its original volume, but the other increased to 36.2 percent thereof. The live yeast dough was porous, with bubbles present, while the other was dense, had no porosity, and had an erupted top. At the end of 30 minutes, the dough with the live yeast decreased from 86 percent to 82 percent and the other from 36.2 percent to 22.7 percent of their respective original volumes. The former still retained its porous appearance.

The yeast cell count of the live yeast dough was 1.57 trillion per gram after mixing and increased to 2.35 trillion after proofing. Viable yeast cells were not detected after 3 minutes of baking. The cell count of the dead yeast dough was 9,000 per gram after mixing, 3,700 after proofing, 3,900 after 3 minutes of baking, and none thereafter.

Dr. Morgareidge concluded that in the case of the dough with live yeast, leavening, due to yeast, had taken place, and that the steam or water in the dough had had no effect. He explained that the greater part of the increase in volume had taken place prior to baking and that no marked change occurred during the time when steam was being generated. He said that steam escaped from the product and formed water vapor in the oven but had no demonstrable effect on the article. He agreed that steam was constantly being replaced by additional

steam until the water was exhausted and that the water content was considerably reduced by the time the 30-minute baking period was over.

Dr. Morgareidge also prepared samples by rolling each type of dough to a thickness of 4½ mm., proofing for 2 hours, and baking for 10 minutes at 260° C. (500° F.) (plaintiff's illustrative exhibits 22 and 23). After proofing, the dough with live yeast was 7 mm. thick, while the other was about 5 mm. thick. The thickness remained the same after baking. He testified that illustrative exhibit 22, from the live yeast dough, was thicker and contained numerous small pores. An examination of these samples shows them to be hard, tough products, which do not resemble Ry-King. Visually, they appear almost the same.

After a careful study of the evidence outlined above, it is our conclusion that plaintiff has not established that yeast was *the leavening* substance used in the preparation of Ry-King, for the following reasons:

The evidence established that yeast was one of the ingredients of Ry-King and that it gave a distinctive flavor to the product. Dr. Karp's tests showed further that fermentation had occurred, but not necessarily leavening.

According to the witnesses Thomson, Garrison, and Schweitzer, and "A Treatise on Baking" by Julius E. Wihlfahrt, referred to several times in the course of the trial, the gluten in rye flour does not have the same characteristics as that in wheat flour and will not develop a skin or skeleton on the dough which will hold the carbon dioxide produced on fermentation long enough for the dough to rise and retain its shape during baking. Even Dr. Karp agreed that a loaf of soft rye bread could not be produced with rye flour alone, although he believed that Ry-King was a porous, well-risen bread, leavened by yeast.

Mr. Garrison testified, however, that he had experimented with various ways of leavening Ry-Krisp and had found that steam was the only possible method, because a constant flow of gas was necessary and the amount of carbon dioxide produced by yeast was too small and could not be retained long enough.

The test samples made by the Government's witnesses show that yeast has no leavening effect on this type of product. Ry-Krisp, made with and without yeast, exhibited the same characteristics, except for slight differences in taste and color. In two attempts to follow the Ry-King formula, yeast had no effect on the resultant products. A great difference does appear, however, between Mr. Schweitzer's samples (defendant's illustrative exhibits O, P, and Q) and Mr. Garrison's samples (defendant's illustrative exhibits R and S), due to the fact that Mr. Schweitzer used less water. Mr. Schweitzer's

products are hard and tough, while Mr. Garrison's resemble Ry-King. It is clear that the quantity of water used is very important, which supports the view that this type of article is steam leavened.

Dr. Karp himself testified that there is a tendency in his technique to use as much water as possible, because it aids the yeast cells and results in better porosity of the product. According to his testimony, the temperature of the dough is 32° C. (89° F.) when it enters the oven, and the temperature of the oven is 325° C. (617° F.) at the beginning of the baking period and 150° C. (302° F.) at the end. Consequently, the dough must soon reach the temperature of 38° C. (100° F.), at which point little carbon dioxide is produced, and then the temperature of 70° C. (158° F.), at which point the yeast is killed and ceases to have any leavening effect. According to Mr. Garrison, the dough would then fall unless the carbon dioxide were replaced by a constant flow of steam. That a considerable amount of steam is generated and escapes is indicated by the fact that the dough contains a large quantity of water, but the finished product is dry and crisp. All of this leads to the conclusion that steam has an important leavening effect upon the article.

We do not think that Dr. Morgareidge's experiments demonstrate the contrary. He showed that under laboratory conditions yeast would cause rye dough to ferment and increase in volume prior to baking and that such increase would not be lost thereafter. Because no marked change took place during the time when steam was being generated, he believed it had no leavening effect. It is significant, however, that in the flat articles which Dr. Morgareidge baked from the same dough, there is no noticeable difference between those made with yeast and those made without yeast. In fact, Dr. Morgareidge's samples are hard and tough, somewhat like Mr. Schweitzer's, again indicating the importance of the water content, and, consequently, the effect of the steam generated therefrom.

We conclude that yeast may have some leavening effect on Ry-King, just as the air beaten into the Ry-Krisp mixture has some effect, but the final and permanent leavening of the finished product is caused by steam. Under the provisions of paragraph 1623, yeast must be *the* leavening substance used in the preparation of the article, not one of several such substances. On the record presented, Ry-King cannot be classified as the type of bread exempted from duty under paragraph 1623, or under said paragraph, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52373, and the President's proclamation of April 27, 1950, T. D. 52462. The protest is overruled, and the collector's classification of Ry-King, light, thin, under paragraph 733, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as biscuits, wafers, or similar baked articles at 10 per centum ad valorem, is sustained. Judgment will be rendered accordingly.